OPINION OF THE COURT
Fahey, J.
On this appeal we consider the admissibility of evidence seized following defendant’s arrest in the lobby of an apartment building in Manhattan that was enrolled in the trespass affidavit program (TAP). Under the particular facts and circumstances of this case we conclude that the record supports the lower courts’ determinations that the police had an objective credible reason to approach and request information from defendant, and thus to begin the encounter that culminated in his arrest and the seizure of the disputed evidence.
Defendant pleaded guilty to three counts of criminal possession of a weapon in the third degree, but on this appeal he challenges only one of those charges, which is based on the discovery of a razor blade on defendant’s person following his arrest for criminal trespass in the third degree on April 21, 2009. Defendant sought suppression of the razor blade on the ground “that he was unlawfully stopped and arrested,”[1] and at the ensuing hearing the People presented the testimony of a police officer who participated in the seizure of that weapon.
On the date in question, the police officer was directed to conduct a foot patrol in a Manhattan neighborhood and, in furtherance of that assignment, he looked into buildings for *142 the purpose of locating either trespassers or those committing other crimes. The officer targeted buildings enrolled in the TAP, which he characterized as a form of solicitation of police assistance for structures that are prone to trespassers.[2] The officer stated that buildings included in the TAP have signs denoting their enrollment, and that trespassers are subject to arrest. While on his foot patrol the officer observed such a sign at an apartment building on West 129th Street, and he and his police partner entered that building apparently for the purpose of conducting a “vertical patrol,” that is, a sweep of each floor of the building.
When they entered the building, the officers saw defendant standing in its lobby. Within a few minutes they asked defendant “what he was doing [there].” Defendant responded that he was visiting a friend but, upon further questioning, defendant acknowledged both that he could not identify that friend and that he did not live in the building. The officers then arrested defendant, whereupon the testifying officer’s police partner frisked defendant and found a razor blade in one of his pants pockets. Although there was no private security guard in front of the building, the testifying officer recalled that the door to the building had a lock on it, and that he saw a sign indicating that the building was enrolled in the TAP when he entered that structure.
*143 The hearing court denied suppression of the razor blade, concluding that “[b]ecause the building [was] part of the [TAP, the testifying officer] had an objective credible reason to ask defendant why he was there,” and defendant subsequently pleaded guilty to, inter alia, the relevant count of criminal possession of a weapon in the third degree. On appeal, the Appellate Division affirmed, writing that the testifying officer’s observation of “defendant standing in the lobby of a [TAP] building . . . gave [him] an ‘objective credible reason’ to ask defendant whether he lived there, which constituted a level one request for information” under this Court’s long-standing metric for evaluating police-initiated encounters with civilians (110 AD3d 498, 498 [1st Dept 2013], quoting Hollman, 79 NY2d at 190). The Appellate Division further concluded that the testifying officer’s
“inquiry was not based merely on the reputation of the area, but also on the fact[s] that the building was so prone to trespassing that the landlord had request [ed] police assistance in removing intruders!,] • • • that defendant was in a plainly nonpublic lobby of a posted trespass affidavit building, and that the officer was aware of this at the time he made his inquiry” (110 AD3d at 498-499 [internal quotation marks omitted]).
A Judge of this Court granted defendant leave to appeal (23 NY3d 1034 [2014]).
Our analysis begins with the points “that whether police conduct in any particular case conforms to De Bour is a mixed question of law and fact,” and that, in such circumstances, “our review is limited to whether there is evidence in the record supporting the lower courts’ determinations” (People v McIntosh, 96 NY2d 521, 524 [2001]). On the merits, our analysis proceeds under the first of the four levels of De Bour, which sets a low bar for an initial encounter: it “permits a police officer to request information from an individual and merely requires that the request be supported by an objective, credible reason, not necessarily indicative of criminality” (People v Moore, 6 NY3d 496, 498 [2006]; see De Bour, 40 NY2d at 223).
Here the record reflects that the encounter occurred in a private space restricted by signage and a lock, and that police assistance in combating trespassing had been sought through enrollment in the TAP. Put simply, the coupling of defendant’s *144 presence in the subject building with the private and protected nature of that location supports the intrusion giving rise to what became the seizure in question. We conclude that there is record support for the determination that the police had an objective credible reason to request information from defendant (see generally People v Hendricks, 43 AD3d 361, 362-363 [1st Dept 2007]; People v Tinort, 272 AD2d 206, 206-207 [1st Dept 2000], lv denied 95 NY2d 872 [2000]).[3]
In so concluding we note that the police patrol at issue here was intended in part to combat trespassing, that is, “knowingly entering] or remaining] unlawfully in or upon premises” (Penal Law § 140.05), that the building at issue was enrolled in the TAP for the purpose of addressing that problem, and that this branch of the TAP is rooted in tenant protection throughout Manhattan. Under these circumstances a police officer could have identified a trespasser only by requesting information.
Accordingly, the order of the Appellate Division, insofar as appealed from, should be affirmed.

. That request arguably implicates one of the higher levels of the multitiered framework for evaluating police-initiated encounters with private citizens, including those that occur in residential apartment buildings (see People v Roque, 99 NY2d 50, 52 [2002]), that this Court established in People v De Bour (40 NY2d 210, 223 [1976]) and People v Hollman (79 NY2d 181, 184-185 [1992]). But heretofore defendant has not approached this suppression question as implicating anything other than a level one De Bour inquiry, and we thus do not consider his belated request at oral argument to apply a different level of that framework (see generally People v Lovett, 25 NY3d 1088, 1091 [2015]). Nor do we have any cause to address the propriety of either of the police officers’ hypothetical actions in the event defendant had refused to respond to his inquiry, as defendant advances no arguments in that respect.

. This Court has similarly described the TAP:
“Often a building owner or manager files a ‘trespass affidavit’ with police stating that the building has been plagued by illegal drug trade and asks police to patrol the building for trespassers. Police then stop people they encounter in the halls to ask for identification and to inquire if they are residents or otherwise lawfully in the building” (Roque, 99 NY2d at 52).
We note, however, that Roque’s description of the TAP is not perfectly applicable here because the materials before us reflect that the New York County District Attorney’s Office, not the New York City Police Department (NYPD), controls the enrollment of buildings in the TAP in Manhattan. That distinction is arguably material to this matter given the reference by amici including the New York Civil Liberties Union to discovery in Ligon v City of New York (925 F Supp 2d 478 [SD NY 2013]), a class action brought against the City of New York and the NYPD challenging “stops made by the police on suspicion of trespass outside of certain privately-owned buildings in the Bronx” (id. at 483). Based on Ligón, the amici contend that the order appealed from “rests on the faulty assumption that enrollment in the [TAP] signifies that a building is the site of criminal activity.” We do not, however, credit that point here inasmuch as the materials before us reflect that the TAP is administered differently in Manhattan than it is in New York City’s other boroughs.

. Our decision herein does not conflict with McIntosh (96 NY2d 521), which teaches that geography alone, that is, mere presence in a high-crime location, does not provide a predicate for even a level one De Bour inquiry (see id. at 526-527). The intrusion here was borne of more than simply presence in a high-crime neighborhood, inasmuch as it was based on defendant’s presence in a private area of a building, to which access was restricted by signage and a lock, and which was enrolled in the TAP.